**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3064-23

JOSEPH CONROY,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

RYAN KLEIMAN,

    Defendant-Respondent/
    Cross-Appellant,

and

RKJC HOLDINGS, LLC, a New Jersey
Limited Liability Company,

    Defendant.

_____

Argued June 4, 2025 – Decided August 18, 2025

Before Judges Marczyk, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-000052-22.

R. James Kravitz argued the cause for appellant/cross-respondent (Fox Rothschild, LLP, attorneys; R. James Kravitz, of counsel and on the briefs; Brittany M. Barbet, on the briefs).

John C. Eastlack, III, argued the cause for respondent/cross-appellant (Lauletta Birnbaum, LLC, attorneys; Gregory A. Lomax and John C. Eastlack, III, of counsel and on the briefs).

PER CURIAM

Plaintiff Joseph Conroy appeals from the trial court's June 9, 2023 order granting defendant Ryan Kleiman's motion for a protective order, imposing sanctions, dismissing plaintiff's amended complaint, and awarding defendant counsel fees. Conroy further appeals the trial court's August 28, 2023 order denying his motion for partial reconsideration. He also appeals the trial court's April 30, 2024 order granting certain dissolution relief and the court's May 20, 2024 order striking plaintiff's exceptions to an accounting. Kleiman cross-appeals from the trial court's August 28, 2023 order contesting the amount of attorney's fees awarded by the court. Following our review of the record and the applicable legal principles, we affirm all orders.

I.

RKJC Holdings, LLC (RKJC) is a New Jersey limited liability company that was formed in 2018 by its only two members, Kleiman and Conroy, who each owned fifty percent of the company. RKJC's wholly owned subsidiary,

2

R&J Delivery, LLC (R&J) delivered packages for Amazon. Under the agreement with Amazon, RKJC managed a fleet of vans it leased and maintained out of a warehouse in Langhorne, Pennsylvania to deliver Amazon packages. Kleiman and Conroy were paid a salary and received distributions from RKJC for performing various duties.

In October 2021, the parties' relationship began to break down. Conroy alleges that while he was away on vacation, Kleiman informed him he was fired. Upon his return from vacation, his identification badge did not work at the warehouse, and he was informed he was not allowed to enter. However, Kleiman asserts Conroy abandoned his duties and never came back to work at the warehouse.[1]

During this time period, Kleiman used his company email to contact an attorney, Alan Ettenson.[2] All of the emails had the subject "Amazon contract" and identified Kleiman as a managing member of R&J. Specifically, Kleiman emailed Ettenson on October 17, stating he

---

[1]  Kleiman notes Conroy continued to be paid over $275,000 over the next several months.

[2]  Conroy claims Ettenson was RKJC's "[c]ompany counsel."  To support this assertion, he points to an email from August 2020, where Kleiman sought counsel from Ettenson regarding a federal loan application for RKJC and copied Conroy on the email.

would like to move forward with the process of removing [Conroy] from [the] business. I understand it's a difficult process but I am ready to begin. I will be in touch with Amazon tomorrow to see how things would work on their end. . . . I understand you're not interested in going to trial if it would come to that, would you have a partner at work that might be interested in working with me on this?

In another email to Ettenson that same day, Kleiman asked:

[I]f I were to dissolve [RKJC and R&J], could I take the money in the accounts prior to dissolving for use in the new company? What if any exposure would I have if I did this? Could I be subject to a court order to repay 1/2 the amount withdrawn from the partnership accounts or could [there] be additional punitive damages based on this action alone?

Ettenson replied on October 18, suggesting Kleiman not "take any action at this time" as it "could be detrimental to your overall case, such as transferring funds to another account." He also advised Kleiman to "wait on [creating] a new entity at this time," and noted he foresaw "this heading to a court suit if you can't resolve issues with [Conroy]."

On October 19, following this exchange with Ettenson, Kleiman emailed a representative from Amazon, Julian Goodman, stating:

[I s]poke [with] my attorney yesterday. He said to hold off on [the new] entity for the moment but asked if Amazon could tell me if they will approve the [new] entity when the time comes and how long the changeover will take or will it be simultaneous to avoid a gap in work.

4

Later that day, Kleiman sent another message to Goodman, stating: "I will keep you posted as to what my attorney suggests as far as [Conroy] and I." He also clarified he was not "looking to terminate [his] business with Amazon, possibly just creating a new entity."

On October 26, Kleiman and Goodman communicated again, with Goodman stating he was "the person that ha[d] to initiate this entity change process," and requested the "timeline . . . and if there will be any required downtime with the change." He also asked if Kleiman had "established the new entity." Kleiman responded, stating:

> I have not established a new entity yet. I was going to do that as soon as I was made aware Amazon would be OK with recognizing the new entity based on the current circumstances. . . . I suppose all I need to know is what documentation if any Amazon would need before recognizing the new entity. Then we can move forward.

On March 31, 2022, Amazon advised RKJC they were going to shut down the Langhorne warehouse in May 2022.[3] Kleiman advised Conroy of an opportunity to move RKJC's warehouse to Northeast Philadelphia, but Conroy declined. Thereafter, Kleiman signed a separation agreement with Amazon effective May 25, 2022, to terminate RKJC's services for Amazon. The

---

[3] Amazon closed the Langhorne warehouse, and RKJC ceased all operations as of May 25, 2022.

A-3064-23

agreement required RKJC to return its leased vans to Element Fleet Corp. and pay the repair costs determined by Element. The agreement stated in relevant part:

> Repair costs will be determined by reference to the . . . inspection and repair estimate provided . . . for each Branded vehicle. . . . Amazon will only assume repair costs which total no more than $5,000 per Branded vehicle. . . . The Company Parties hereby assign to Amazon all rights to dispute, appeal, or assert claims . . . and the Company Parties will cooperate fully with Amazon with respect to such disputes, appeals, and/or claims.

At the time of the agreement, Conroy was represented by attorney Robert Incollingo. Kleiman was represented by the law firm Lauletta Birnbaum, including attorneys William Eisenstadt, Gregory Lomax, and John Eastlack III. Incollingo authorized Kleiman to sign the separation agreement in an email to Eisenstadt on May 10, 2022, stating "Kleiman may sign the Amazon separation agreement on behalf of" RKJC.

By way of background, Conroy asserts that when starting the business, he opened accounts, signed leases, set up phone services, and "handled all administration." He claims he was the "email administrator" or "[c]ompany administrator."[4] Conroy relies on texts between he and Kleiman in November

---

[4] Kleiman asserts he never agreed that Conroy would be an account administrator with full access to Kleiman's email account or ability to read and

A-3064-23

2020, where Kleiman texted Conroy stating: "I had an email sent to reset the password to the account administrator which I assume is you." Conroy confirmed the password reset. Importantly, however, the exchange between Conroy and Kleiman shows that the text was not referring to Kleiman's email, but rather a general email account used by other employees to communicate with drivers.

R&J had an employee handbook that took effect in September 2018 (2018 Handbook). The 2018 Handbook had a section titled "Technology & Computer Systems Policies." In relevant part, the policy provided that employees had no expectation of privacy when using company computers, devices, or networks. It further stated the company may access all activity and communications, and may request passwords for company accounts and devices. Further, all company-provided email and accounts are owned and monitored by the company, and personal information should not be stored on company systems if privacy is desired. The 2018 Handbook identified Kleiman as the "Company Administrator."

_____

use his privileged attorney-client communications. He asserts there was no agreement appointing Conroy as company administrator who could unlock Kleiman's passwords, monitor Kleiman's emails, or delete them.

A-3064-23

However, the 2018 Handbook was superseded by an employee handbook which took effect in February 2021 (2021 Handbook). The front cover of the 2021 Handbook states it "supersedes all previously issued employee handbooks, and all previously issued employee handbooks are hereby revoked." Both parties acknowledge that the 2021 Handbook did not have an electronic communication policy.

Conroy filed his original complaint in June 2022, asserting two counts, one seeking dissolution of RKJC and another seeking an accounting. The complaint alleged Kleiman froze Conroy out of the company, and it was not reasonably practical to carry on the business. Kleiman filed an answer on August 11, 2022.

Meanwhile, between July 6 and 7, 2022, Kleiman emailed[5] his attorneys at Lauletta Birnbaum. Kleiman sought advice on how to dissolve RKJC and R&J as the business had ceased to operate, stating he would "not be using either company for anything. My focus now is how best to move forward with . . . [Nicholas Morgan] who will be starting a new company with Amazon." Eisenstadt responded, with the phrase "Privileged and Confidential Contains

---

[5] Kleiman claims these emails were sent from his company laptop while at home, not at the Langhorne warehouse. He also claims he accessed the emails through the web.

A-3064-23

Advice of Counsel" noted at the top of his email, explaining he felt "obligated"

to remind Kleiman that the business structure in place

> obligates each member to get the consent of the other for any decisions. Clearly that is not what has been going on for some time and as you wrap this . . . business down, it will be more of the same. I honestly am not sure what [Conroy] would or could do with that fact, but I would be remiss if I did not emphasize it is a potential liability to the extent [Conroy] is unhappy with the end result. Regarding what happens by leaving the company in place after you close out the Amazon business, I agree we have talked about it extensively and you understand the risks.
>
> We are happy to speak with you about moving forward, but I do want to tell you that to the extent it is business that the current company could or would have done . . . there will be additional possible claims by [Conroy] that those business opportunities should have been pursued in the current company and that by pursuing them outside of the [c]ompany, you are breaching your duty of loyalty to the company.

Most of the emails sent from Eisenstadt or Lomax to Kleiman contained

the following notice at the bottom of the email:

> Notice. This email . . . [is] intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email . . . and any use of the information contained is strictly prohibited. If you received this e-mail in error, please contact the sender and delete it from your computer. Unless expressly stated in this e-mail, nothing in this message . . .

should be construed as a digital or electronic signature
or as a legal opinion.

Conroy was not a party to these emails.

In September 2022, Conroy contends he reached out to Incollingo, seeking "advice as to whether [Conroy] could access, preserve and use emails on the [c]ompany's email accounts, including those from Kleiman." Incollingo informed Conroy he could access the emails because he "was the email administrator, the emails belong to the [c]ompany, and Conroy was an equal owner of the [c]ompany." Conroy asserts that "[b]ased on [this] advice, [he] accessed . . . Kleiman's [c]ompany email account."

On September 22, 2022, Conroy proceeded to forward both the October 2021 email chain between Kleiman and Ettenson and the July 2022 email chain between Kleiman and Lauletta Birnbaum to his own personal email account. He then proceeded to delete the emails that he forwarded to himself from Kleiman's company email account. This was all done without Kleiman's knowledge or consent.

On October 27, 2022, Incollingo deposed RKJC's accountant, Robert Peterson, CPA. The court later determined that questions from this deposition were clearly only asked because Conroy and his counsel had obtained the Ettenson and Lauletta Birnbaum emails. Kleiman's counsel was not aware Conroy had the emails at the time of this deposition.

10

On November 29, 2022, Conroy notes that "[w]ith the evidence from the [e]mails, as well as Kleiman's communications with nonlawyers (Amazon)," he filed an amended complaint, asserting ten additional counts under various fraud and breach of fiduciary duty theories against Kleiman and others, including an employee of RKJC, Morgan. The amended complaint asserted Kleiman and Morgan usurped a corporate opportunity belonging to RKJC by allowing RKJC to "wither" away, lose its contract with Amazon, and formed a new company, Nick of Time Logistics, LLC (Nick of Time).[6] At this time, Kleiman and his attorneys were still unaware that Conroy had the October 2021 and the July 2022 emails in his possession.

In response to Kleiman's discovery requests, Incollingo emailed Lauletta Birnbaum in March 2023, explaining he

> reviewed two runs of related documents produced by my client . . . . I am of the opinion that these documents are probative evidence on the allegations in the pleadings. I am of the further opinion that the referenced documents contain sensitive information that your firm may want to designate as confidential, to be used in this litigation only. Given their content and character, your firm may wish to participate with me in the preparation of a consent order for their production under a protective order for their free use in this case, but not outside it.

---

[6] Kleiman asserts Nick of Time engaged in preliminary discussions with Amazon to open a new business near Pittsburgh, but no business was ever opened.

A-3064-23

Incollingo further stated that if an agreement could not be reached as to use of the emails, he would "produce the full measure of the documents . . . to all counsel." Lauletta Birnbaum responded to Incollingo that same day, stating that without seeing the documents or having a better description as to what the documents were, it did not "know how to respond."

On March 8, Incollingo sent the "documents" to Lauletta Birnbaum, which were the two Ettenson and Lauletta Birnbaum email threads. Lomax immediately responded that the documents were "obviously privileged attorney client communications" and insisted they "should be destroyed."

Incollingo refused to delete the emails because he believed they were "probative evidence lawfully obtained by [Conroy] and provided to [Incollingo] for use in [Conroy's] case against" Kleiman. Incollingo also stated the emails "evidence [Kleiman's] intentions to jettison [Conroy] from the business and usurp a company opportunity as pleaded in the amended complaint." Lomax requested that Incollingo suspend an upcoming deposition of an Amazon representative, however, Incollingo refused.

On March 23, 2023, Kleiman moved for a protective order, seeking leave to file the emails under seal, for sanctions, and for a protective order staying discovery until the trial court resolved the privilege issue. Conroy opposed the motion. On April 14, 2023, the trial court granted Kleiman's

12

motion and ordered Conroy to turn over all communications between Kleiman and counsel, and stayed discovery.

On May 1, 2023, Kleiman moved for sanctions, a protective order, and attorney's fees. The trial court issued an oral decision on June 9, 2023. As to the July 2022 Lauletta Birnbaum emails between Kleiman, Lomax, and Eisenstadt, the court found the email exchange took place

> a week after [Conroy] filed his initial complaint. These emails bear a standard hallmark of attorney-client messages including a warning that the emails are intended only for use by the address[ee] and nature and may contain legally privileged and/or confidential information . . . .
>
> The emails also advised the reader, if the reader is not the intended recipient, then any use of the information contained is strictly prohibited. In one of the emails, [it] states in large bold-faced font "privileged and confidential contains the advice of counsel."
>
> In these emails, [Kleiman] sought advice of how to proceed with winding up RKJC's affairs . . . .
>
> In response, . . . Eisenstadt advised [Kleiman] on the risks and advantages of taking certain actions including . . . potential liability of taking certain actions on behalf of RKJC without [Conroy]'s involvement in pursuing another . . . business. . . .
>
> . . . .
>
> . . . There's no evidence to suggest Lauletta [Birnbaum] was representing the company during the course of this email exchange.

13

Regarding the October 2021 emails between Kleiman and Ettenson, the court noted:

> [A]round the time that the relationship between the parties was severing[,] . . . [Kleiman] sought legal advice from . . . Ettenson concerning potential[ly] expelling [Conroy] from the company and dissolving it. [Kleiman] also asked . . . Ettenson what his exposure to [Conroy] would be if he took certain actions against [Conroy]. In response, . . . Ettenson advised [Kleiman] how to proceed and recommended that he hire another attorney to litigate the matter.
>
> The parties had sought legal advice [from Ettenson] on behalf of the companies in August of 2020. All of the emails that were exchanged a year later in October 2021 show [Kleiman] sought legal advice in his individual capacity and not as an agent of the companies.
>
> Additionally, [Kleiman] used his personal funds to pay . . . Ettenson $130 in connection with this legal advice in the emails.
>
> What occurred subsequent thereto, meaning the company was defunct because Amazon moved in May of 2022[, i]n June of 2022, the complaint was filed, and then . . . [i]n September 2022, [Conroy] accessed [Kleiman]'s email account.
>
> [Kleiman]'s email account was an email account from the company. However, it was his personal email account with the company. It wasn't a general mailbox directed to mail that you would be able to see . . . . It was his personal email account that he utilized but it was with the company.

The court then addressed Conroy and Incollingo's conduct:

14

[Conroy] then surreptitiously went into a password-protected email account that [Kleiman] was using in order to access the emails. [Conroy] thereafter forwarded them to his own personal private email account . . . . That's not been disputed by [Conroy], and frankly, is substantiated by the emails that were provided by [Kleiman] in support of their motion. . . .

[Conroy] . . . subsequently deleted the sent folder . . . and the deleted folder to hide the fact that he went into [Kleiman's] personal email account and forwarded them to himself. He hid his tracks. He purposely went in and deleted any evidence that he had been in there.

So [Conroy] himself had these emails at least as early as September . . . 2022. This was three months after [Conroy] filed the action, four months after the business had ceased all operations. This . . . information was not provided to . . . Lomax by . . . Incollingo until six months thereafter.

There was a demand by . . . Lomax that . . . Incollingo destroy the emails. . . . Incollingo refused to do so, asserting that it was probative evidence; it was lawfully obtained by his client, and that he used them to formulate the . . . amended complaint, and that's evidenced by the submission in an email . . . from . . . Incollingo to . . . Lomax dated March 13, 2023.

"They evidence his intention to eject my client from the business and shutter the company opportunity as pleaded . . . in the amended complaint["] which . . . shows that the amended complaint was based upon the emails, and I think what's also pretty clear is that the deposition of . . . Peterson . . . was clearly influenced by the emails

15

A-3064-23

because there were questions that had been posed where . . . there is no way that information would have been gathered from any other source at that particular time except for the reading of the emails.

And the same thing with the . . . amended complaint. It is based on information that was gained as a direct result of him reading the emails that were sent between the attorney for [Kleiman] and his client.

. . . Incollingo's position is that because [Conroy] was the plan administrator or the system administrator as they're called for the computer system that the emails were therefore lawfully obtained and can be used in the litigation even though admittedly they are attorney-client communications.

. . . .

There is no electronic communication policy for both RKJC and R[&]J that would prohibit a personal use of company laptops. [Kleiman] sent the emails from his residence and the account was accessed via the web.

. . . Incollingo refused to destroy the emails. There was a motion for a protective order to file the documents under seal. In that opposition to that motion that the [c]ourt already decided, [Conroy] certified that he was the account administrator . . . . [Conroy] assumed his administrator role when [he] created these email accounts with [G]o[D]addy.com when the companies were first formed in 2018.

. . . .

During oral argument of the motion, . . . Incollingo contended that [Kleiman]'s attorney-client emails were proof of [Conroy]'s cause of action. The

16

[c]ourt granted the application to file this instant motion under seal and here we are today.

The only case . . . on point relating to the instant motion is [Stengart v. Loving Care Agency, Inc., 201 N.J. 300 (2010)]. . . .

The court proceeded to discuss Stengart; N.J.S.A. 2A:84A-20 and N.J.R.E. 504; the work-product privilege doctrine; fraud on the court; and disqualification of counsel.

The court then stated:

> Stengart is directly on point, and it compels the conclusion that [Kleiman]'s emails with [Lomax and Eisenstadt] . . . [were] protected by the . . . attorney-client privilege. There is no doubt that [Kleiman] had a reasonable expectation of privacy when he communicated with his attorneys even though it was through his work email account, even though it was a company laptop just as in Stengart, and even although different because it was a work email account, it was password-protected. He had a reasonable expectation that a password-protected account would not be visible in anybody else's eyes.
>
> [Kleiman] never shared that password with . . . [Conroy]. He never shared it with anybody. The facts . . . indicate that [Kleiman] did not believe that the emails would be read and sent to [Conroy], especially after the business was shut down. Especially after he had not been involved with the company for quite some time. And especially after the litigation had already commenced.
>
> The [c]ourt finds that [Kleiman]'s expectation of privacy was also objectively reasonable. The emails [tell] the reader[,] like [in] Stengart[,] that the emails

17

are intended only for the use by the addressee named herein and maintain legally privileged data or confidential information. The emails also advised that if the reader is not the intended recipient that any use of the information contained is strictly prohibited.

Significantly, [Kleiman] did not have a reason to believe that [Conroy] could access his work email accounts since the company maintained no policy that prohibited personal use or a potential[] warning that [Conroy] could monitor these accounts.

[Conroy]'s main point is that he was the account administrator and had full access to the emails but how he accessed them doesn't vitiate the attorney-client privilege. The privilege still attaches in these emails.

They are protected as well under the work product doctrine. They were prepared in anticipation and for the use for other litigation. They all render legal advice to [Kleiman] advising him of potential claims. They were prepared by the attorneys as a result of litigation and they are protected.

There is no doubt that [Conroy]'s conduct was deliberate and it was improper and that it was an attempt to avoid the rules of discovery to gain an unpermitted advantage in this litigation. [Conroy] accessed [Kleiman]'s password-protected email account. He found attorney-client emails that he found useful in this case. He forwarded those emails to himself. He forwarded them to his attorney. He doesn't deny that he purposely [deleted] them from the emails that were sent to him, the sent and deleted folders. He did [this] so that his acts . . . could go and remain undetected.

[Conroy] accessed the email account three months after [he] filed suit and four months after the

A-3064-23

business had essentially ceased all operations. His accessing of those emails was deliberate and he was fishing for information.

The court continued to address whether Incollingo violated RPC 4.4(b) and the remedy for his and Conroy's conduct. The court stated:

> [Incollingo] doesn't believe that [the emails were] wrongfully obtained, but he knew because of the way the email was set up that it was forwarded to him, and once he came across that email that was provided to him by his client and he saw the language "personally confidential," he had an obligation under [RPC 4.4(b)] . . . . to advise [his] adversary. He did not do that. He didn't do that until March [2023].
>
> That is after the cat was out of the bag and the deposition of . . . Peterson, and it was after the amended complaint was filed alleging and bringing in new parties and alleging []fraud and the other counts that were brought to bear.
>
> The question then before the [c]ourt is what is the remedy. The remedy as an initial matter is as follows: [Conroy] and . . . Incollingo, are going to return the emails to [Kleiman]'s counsel. They're going to delete and destroy any copies of them that are in their custody and control.
>
> . . . .
>
> . . . [S]econd . . . to protect the profession, to protect the sanctity of the profession, and to protect the sanctity of the attorney-client relationship and . . . to make certain . . . this does not occur in the future[,] . . . the [c]ourt has very limited options.
>
> The clear option is to dismiss the amended complaint and restore the matter to where it was at the

19

> beginning of the litigation. The [c]ourt is going to dismiss the amended complaint because it's clear that [the] amended complaint was filed based upon the information that was obtained as a result of the attorney-client privileged emails.
>
> I'm reinstating the original complaint . . . [for] dissolution of the LLC and then an accounting.

The court also granted attorney's fees for Kleiman subject to the submission of appropriate certifications. The court explained it was not dismissing the "entire litigation because [it] needs to be resolved. This company needs to be dissolved. It needs an adjudication." The court further ordered that Peterson's deposition be redacted as it was "obtained with answers that clearly bring out the fact that the information was provided as a result of attorney-client privilege." The court also noted it was "not going to order a hearing with regard to whether or not there was a fraud perpetrated on" it, as "the only issue right now . . . is the dissolution of" the companies. The court memorialized these findings in its June 9, 2023 order.

Thereafter, Incollingo filed a certification affirming the emails were deleted and destroyed. Incollingo withdrew his appearance as counsel in July 2023, and successor counsel, James Kravitz, who had not seen the emails, entered his appearance on behalf of Conroy. Kleiman's counsel also filed a certification of services requesting $151,050.38 in attorney's fees.

20

Conroy's new counsel moved for partial reconsideration to stay resolution of the fee award and discovery and obtain the transcript of the prior proceedings, so that he could file a more comprehensive reconsideration motion. Kleiman cross-moved to enforce litigant's rights, for attorney's fees, and other relief. On July 19, 2023, the trial court issued an order authorizing Conroy to amend his motion for reconsideration after his new counsel received the underlying motion papers, which were sealed. Conroy then filed an amended motion for partial reconsideration under seal.

The trial court held oral argument on August 25, 2023, regarding Conroy's motion for reconsideration and the issue of Kleiman's attorney's fees. The court upheld its findings and determined Incollingo's conduct was the "worst bad faith" and that it "shines a very bad light on lawyers." As to Kleiman's attorney's fees, the court found the requested fee was "shockingly high" for a "simple one-case type of precedent." The court acknowledged Kleiman's attorneys had to have "all hands on deck," and that the hourly rates were reasonable. The court awarded Kleiman $30,000 in attorney's fees plus costs for a total of $31,073.23, and denied Conroy's motion for partial reconsideration. The court also set discovery end dates for written discovery (September 27, 2023) and depositions (October 27, 2023).

21

A-3064-23

In October 2023, the trial court entered a consent order appointing a neutral accountant, Marcum LLP (Marcum) to prepare an accounting. The consent order provided:

> 6. This [c]onsent [o]rder is without prejudice to either parties' right to: (a) assert spoliation claims against the other in the event that either party is responsible for spoliating records; (b) contest the propriety, reasonableness and/or necessity of the repair invoices and/or the failure of a party to seek insurance coverage for the repair invoices.
>
> . . . .
>
> 9. Should any of the parties seek further discovery related to the Accounting, including depositions and the production of documents, they shall first meet and confer, and if an agreement cannot be reached, then the issue shall be brought to the [c]ourt's attention through written correspondence less than three pages in length.

Marcum issued its accounting in February 2024, finding nothing "inappropriate" or "improper." Conroy filed exceptions to the accounting and sought discovery regarding the accounting report. Conroy asserted Kleiman entered the Separation Agreement without Conroy's approval. Conroy also asserted Kleiman did not include Conroy in communications involving the van repairs, including apprising him of Element's repair estimate.

A-3064-23

Kleiman opposed Conroy's request for discovery and exceptions to the accounting. Kleiman asserted Conroy did not identify specific overpayments or vehicle damage and did not support his exceptions with any proofs.

During a case management conference, the court questioned whether Conroy had ever received the email sent on June 17, 2022, from Eisenstadt to Incollingo, which included an attachment of the estimates. The court insisted Conroy be put "under oath" to attest to the assertion that he never got the email. Conroy's counsel responded Conroy indeed had "received it" and would not "say he didn't get the email and he's not going to say that he didn't know the vans had a ding." In an accompanying case management order, the trial court entered judgment in favor of Conroy on counts one and two of the original complaint. On May 20, 2024, the trial court issued an order striking Conroy's exceptions.

II.

A.

On appeal, Conroy asserts the trial court "improperly extended Stengart to shield from an equal owner . . . emails between the other equal owner of the company and the company's lawyer, while using the company email account." He asserts Kleiman was aware Conroy was the "administrator of the email account and had access to email passwords," and that Kleiman was aware of

23

the 2018 Handbook which provided that the "[c]ompany email account was monitored by the [c]ompany." He acknowledges the 2021 Handbook makes no reference to monitoring.

Conroy asserts Kleiman knew Conroy could access the emails and notes the emails to Ettenson were not marked privileged, and Kleiman did not take steps to apply the privilege. Referring to an August 2020 email with Ettenson, Conroy asserts "[t]he fact that Kleiman would [on a previous email regarding a Paycheck Protection Loan] copy Conroy on emails with Ettenson is compelling evidence that both litigants believed that Conroy was entitled to such emails."

As to the October 2021 emails with Ettenson, Conroy asserts they require a separate analysis because Ettenson was RKJC's counsel and "a portion of the communications with Ettenson were disclosed to Amazon, thereby waiving any privilege that might have existed." He also points out that in these emails Kleiman used the company signature stamp which identified Kleiman as the managing member of RKJC, and the subject heading was "Amazon contract." He also asserts the emails "involved a mixture of [c]ompany business and discussions of [tortious] actions Kleiman sought to take." Therefore, he contends it was reasonable for him and his attorney to review the emails.

24

Regarding the July 2022 Lauletta Birnbaum emails, Conroy claims they discussed company matters and "included nothing that was not already addressed in the Ettenson emails." He asserts that because the attorney-client privilege was waived as to the Ettenson emails, the same waiver should apply to the July 2022 emails.

Kleiman counters he had a reasonable expectation of privacy in the communications with his lawyers, because he used a password-protected account, never shared his password, sent the emails from home, and did not think Conroy had the ability to access the communications, especially after the business closed and the lawsuit was instituted. He also asserts he never sent emails over a company server, as the company does not maintain one.

Kleiman also argues RKJC had no policy in place which allowed Conroy to access his emails because the 2018 Handbook was replaced by the 2021 Handbook; that he, not Conroy, was the administrator under the 2018 Handbook; and that even if the 2018 policy did apply, it could not override the attorney-client privilege. He asserts the text thread Conroy relies on to assert he was the administrator is disingenuous, as that thread pertains to another email account—one that was used for "dispatchers to efficiently mass text delivery drivers"—not Kleiman's email. Kleiman also notes there was no

waiver of his privileged communications with Ettenson because he never shared his emails with Amazon or any of their contents.

We review the applicability of the attorney-client privilege de novo. Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013). However, appellate courts apply a deferential standard in reviewing factual findings by a judge. Balducci v. Cige, 240 N.J. 574, 595 (2020).

"New Jersey's discovery rules are to be construed liberally in favor of broad pretrial discovery." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997). However, privileged documents and communications are not discoverable. R. 4:10-2(a). The attorney-client privilege protects "communications between [a] lawyer and his client in the course of that relationship and in professional confidence." N.J.R.E. 504(1). It applies to communications: "(1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and [where] the communication is made in confidence, (4) by the client." Hedden, 434 N.J. Super. at 10.

Pursuant to N.J.S.A. 2A:84A-29 and N.J.R.E. 530(a), a "person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he . . . without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone." "It has been recognized, however, that

not every disclosure constitutes a waiver of privilege." Laporta v. Gloucester Cnty. Bd. of Chosen Freeholders, 340 N.J. Super. 254, 261 (App. Div. 2001).

The parties rely on Stengart in support of their arguments. In Stengart, our Supreme Court recognized "the line separating business from personal activities can easily blur," and as "occasional, personal use of the Internet is commonplace[] . . . complex issues [can arise] about an employer's monitoring of the workplace and an employee's reasonable expectation of privacy." 201 N.J. at 307. The issue addressed by the Court was "the extent to which an employee can expect privacy and confidentiality in personal e-mails with her attorney, which she accessed on a computer belonging to her employer." Ibid.

The plaintiff in Stengart, an executive director of nursing, "used her company-issued laptop to exchange e-mails with her lawyer through her personal, password-protected, web-based e-mail account." Ibid. She later left her employment and filed a lawsuit under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50. See ibid. The defendant subsequently "hired a computer forensic expert to recover all files stored on the laptop including the e-mails, which had been automatically saved on the [company laptop's] hard drive." Ibid. The defendant's attorneys then "reviewed the e-mails and used information culled from them in the course of discovery." Ibid. The plaintiff's attorney "demanded that communications between him and [the

plaintiff—his client], which [the attorney] considered privileged, be identified and returned." Ibid. The defendant's counsel "disclosed the documents but maintained that the [defendant] had the right to review them." Ibid. The trial court, relying on the defendant's electronic communications policy, found the plaintiff "waived the attorney-client privilege by sending e-mails on a company computer." Id. at 308. This court reversed, finding the defendant's counsel "had violated RPC 4.4(b) by reading and using the privileged documents." Ibid. The Supreme Court affirmed our opinion with modifications, and held the plaintiff

> could reasonably expect that e-mail communications with her lawyer through her personal account would remain private, and that sending and receiving them via a company laptop did not eliminate the attorney-client privilege that protected them. By reading e-mails that were at least arguably privileged and failing to notify [the plaintiff] promptly about them, [the defendant]'s counsel breached RPC 4.4(b).
>
> [Ibid.]

The Court remanded to the trial court "to determine what, if any, sanctions should be imposed on counsel for" the defendant. Ibid.

The emails between the plaintiff and her counsel contained a legend at the bottom of the emails warning the reader the email contained confidential

and privileged attorney-client communications.[7]  Id. at 309-10.  After reviewing the emails, the defense counsel "did not advise opposing counsel about the e-mails until months later" when they replied to interrogatories.  Id. at 310.  When the plaintiff's counsel demanded the emails be returned, the defendant's counsel asserted the plaintiff "had no reasonable expectation of privacy in files on a company-owned computer in light of the company's policy on electronic communications."  Ibid.  Although the plaintiff contended the company's communication policy within its employee handbook did not apply to her "as a senior company official," the Court assumed the policy did apply in addressing the issues on appeal.  Ibid.  The policy stated:

---

[7]  Specifically, the provision stated:

> THE INFORMATION CONTAINED IN THIS EMAIL COMMUNICATION IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENT NAMED ABOVE.  This message may be an Attorney-Client communication, and as such is privileged and confidential.  If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that your review, dissemination, distribution, or copying of the message is strictly prohibited.  If you have received this transmission in error, please destroy this transmission and notify us immediately by telephone and/or reply email.
>
> [Id. at 309-10 (internal footnote omitted).]

A-3064-23

The company reserves . . . the right to review . . . all matters on the company's media systems and services at any time, with or without notice.

. . . .

E-mail . . . messages, internet use and communication and computer files are considered part of the company's business and client records. Such communications are not to be considered private or personal to any individual employee.

The principal purpose of electronic mail . . . is for company business communications. Occasional personal use is permitted; however, the system should not be used to solicit outside business ventures . . . unless authorized by the Director of Human Resources.

[Id. at 311 (third omission in original).]

The defendant asserted "its employees have no expectation of privacy in their use of company computers based on" the communication policy, and that "by accessing e-mails on a personal account through [the defendant]'s computer and server, [the plaintiff] either prevented any attorney-client privilege from attaching or waived the privilege by voluntarily subjecting her e-mails to company scrutiny." Id. at 312. It also asserted their counsel did not violate RPC 4.4(b), "because the e-mails were left behind on [the plaintiff's] company computer—not 'inadvertently sent,' as per [RPC 4.4(b)]—and the [defendant's counsel] acted in the good faith belief that any privilege had been waived." Id. at 312-13.

30

The Court began by explaining its analysis "draws on two principal areas: the adequacy of the notice provided by the [communication p]olicy and the important public policy concerns raised by the attorney-client privilege." Id. at 314. As to the adequacy of the notice in the communication policy, the Court found it was "not clear from [the policy's] language whether the use of personal, password-protected, web-based e-mail accounts via company equipment [was] covered," as the policy did "not address personal accounts at all," and thus did not give "express notice that messages sent or received on a personal, web-based e-mail account are subject to monitoring if company equipment [was] used to access the [personal] account." Ibid. The communication policy also did not "warn employees that . . . e-mails [would be] stored on a hard drive," and "create[d] ambiguity about whether personal e-mail use [was] company or private property." Id. at 315.

As to the public policy inquiry, the Court noted the "primary rationale" of the attorney-client privilege "is to encourage 'free and full disclosure of information from the client to the attorney,'" which "benefits the public, [who] 'is well served by sound legal counsel' based on full, candid, and confidential exchanges." Ibid. (quoting Fellerman v. Bradley, 99 N.J. 493, 498, 502 (1985)).

31

The Court noted under Rule 504, "[f]or a communication to be privileged it must initially be expressed by an individual in his capacity as a client in conjunction with seeking or receiving legal advice from the attorney in his capacity as such, with the expectation that its content remain confidential." Ibid. (alteration in original) (quoting Fellerman, 99 N.J. at 499).

The Court further observed, one's right to a reasonable expectation of privacy "derives from the common law and the Search and Seizure Clauses of both the Fourth Amendment" of the United States Constitution "and Article I, paragraph 7 of the New Jersey Constitution." Id. at 316. "The common law source is the tort of 'intrusion on seclusion,' which . . . provides '[o]ne who intentionally intrudes . . . upon the solitude or seclusion of another . . . is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.'" Ibid. (quoting Restatement (Second) of Torts § 652B (Am. L. Inst. 1977)). The Court observed, "[a]s is true in Fourth Amendment cases, the reasonableness of a claim for intrusion on seclusion has both a subjective and objective component." Ibid.

The Court found the plaintiff "had a reasonable expectation of privacy" in the emails because she "plainly took steps to protect the privacy of those e-mails and shield them from her employer. She used a personal, password-protected e-mail account instead of her company e-mail address and did not

32 A-3064-23

save the account's password on her computer." Id. at 321. Accordingly, the Court determined the plaintiff "had a subjective expectation of privacy in the messages to and from her lawyer discussing the subject of a future lawsuit." Id. 321-22. The Court also found the plaintiff's expectation of privacy was "objectively reasonable," because the communication policy did "not address the use of personal, web-based e-mail accounts accessed through company equipment. It [did] not address personal accounts at all. Nor [did] it warn employees that the contents of e-mails sent via personal accounts [could] be . . . read by the company." Id. at 322. It further noted, "[m]oreover, the e-mails [were] not illegal or inappropriate material stored on [the defendant]'s equipment, which might harm the company in some way." Ibid. Rather, they were "conversations between a lawyer and client about confidential legal matters, which are historically cloaked in privacy. Our system strives to keep private the very type of conversations that took place [t]here in order to foster probing and honest exchanges." Ibid.

The Court also noted "the e-mails [bore] a standard hallmark of attorney-client messages" by "warn[ing] the reader directly that the e-mails [were] personal, confidential, and may be attorney-client communications." Ibid. Because the plaintiff "could reasonably expect that e-mails she exchanged with her attorney on her personal, password-protected, web-based e-mail account,

33

accessed on a company laptop, would remain private[,] . . . the attorney-client privilege protect[ed] those e-mails." Id. 322-23.

Furthermore, the Court rejected the defendant's argument "that the attorney-client privilege either did not attach or was waived" because the plaintiff "effectively brought a third person into the conversation from the start—watching over her shoulder—and thereby forfeited any claim to confidentiality in her communications." Id. at 323. The Court found the plaintiff had "the right to prevent disclosures by third persons who learn of her communications 'in a manner not reasonably to be anticipated.'" Ibid. (quoting N.J.R.E. 504(1)(c)(ii)). The Court found the defendant's communication policy "did not give [the plaintiff], or a reasonable person in her position, cause to anticipate that [the defendant] would be peering over her shoulder as she opened e-mails from her lawyer on her personal, password-protected [e-mail] account." Ibid.

The Court stated "[a] person waives the privilege if she, 'without coercion and with knowledge of [her] right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.'" Ibid. (second alteration in original) (quoting N.J.R.E. 530). The Court determined the plaintiff neither "knowingly disclosed the information contained in the e-mails or failed to 'take reasonable steps to insure and

34

maintain their confidentiality.'" Id. at 323-24 (quoting Trilogy Commc'ns, Inc. v. Excom Realty, Inc., 279 N.J. Super. 442, 445-48 (Law Div. 1994)). The plaintiff "took reasonable steps to keep discussions with her attorney confidential: she elected not to use the company e-mail system and relied on a personal, password-protected, web-based account instead. She also did not save the password on her laptop or share it in some other way with [the defendant]." Id. at 324. The plaintiff claimed she was unaware the defendant could read her personal e-mails, and the Court found "[u]se of a company laptop alone does not establish that knowledge. Nor [did] the [communication p]olicy fill in that gap." Ibid. Thus, the Court found neither "a knowing or reckless waiver." Ibid.

In conclusion, the Court stated:

> Companies can adopt lawful policies relating to computer use to protect the assets, reputation, and productivity of a business and to ensure compliance with legitimate corporate policies. . . . But employers have no need or basis to read the specific contents of personal, privileged, attorney-client communications in order to enforce corporate policy. Because of the important public policy concerns underlying the attorney-client privilege, even a more clearly written company manual—that is, a policy that banned all personal computer use and provided unambiguous notice that an employer could retrieve and read an employee's attorney-client communications, if accessed on a personal, password-protected e-mail account using the company's computer system—would not be enforceable.

A-3064-23

[Id. at 324-25 (emphasis in original).][8]

Applying these principles, we conclude the court properly applied Stengart to the facts here. Like the plaintiff in Stengart, Kleiman had both a subjective and objective expectation of privacy in his email exchanges with his attorneys. He had a subjective expectation of privacy because he used a password-protected email account to communicate with his attorneys, and he never shared his login credentials with anyone. He also had an objective expectation of privacy in the absence of an existing company policy warning him that his emails could be monitored. Although Kleiman used a company email account, it was password-protected, and he was not on notice that his private communications to his attorney could later be extracted by another member of the company after litigation between the two had commenced. There was also no electronic communication policy in place at RKJC that would have alerted Kleiman that his emails were being monitored, particularly given that they were password-protected.

---

[8] The Stengart Court also found the defendant's counsel's viewing of the e-mails "fell within the ambit of RPC 4.4(b) and violated that rule. . . . Its error was in not setting aside the arguably privileged messages once it realized they were attorney-client communications, and failing either to notify its adversary or seek court permission before reading further." Id. at 326.

A-3064-23

Kleiman's emails with Lauletta Birnbaum put the reader on notice the emails contained privileged communications. Certain of the emails specifically referenced they were privileged communications. Others had legends at the bottom of the emails putting a reader on notice of the private nature of the communications. Even without the privileged and confidential headings or warnings at the bottom of the emails, a cursory review of the substance of Kleiman's emails to and from both Ettenson and Lauletta Birnbaum reveals that Kleiman was seeking and receiving legal advice from counsel.

Furthermore, Stengart permits employers to enforce their policies regarding personal use of workplace computers, but cautioned "employers have no need or basis to read the specific contents of personal, privileged, attorney-client communications in order to enforce corporate policy." Id. at 325 (emphasis in original). Moreover, under the facts in Stengart, the Court concluded that "[b]ecause of the important public policy concerns underlying the attorney-client privilege, even a more clearly written company manual . . . would not be enforceable." Ibid.

Conroy's assertions that Kleiman waived the attorney-client privilege are also unconvincing. There is no indication Kleiman knowingly or recklessly disclosed or shared with Amazon the actual communications with his

37

attorneys. Conroy's assertion that Ettenson was the company attorney is likewise unpersuasive. As the trial court noted, Kleiman paid for his services and sought legal advice in his personal capacity. Merely because the company used Ettenson for an unrelated issue a year prior to the October 2021 emails, does not in turn make Ettenson the company's counsel indefinitely or block Kleiman from utilizing Ettenson's advice for his personal legal needs. We further conclude Conroy's assertions that he was the company administrator was not only belied by the fact that the 2018 Handbook shows Kleiman was the company administrator, but the other text exchange relied on by Conroy dealt with a different email address used by multiple employees of the company. We conclude the court did not err in determining Kleiman could reasonably expect his emails to his attorneys would remain private and protected by the attorney-client privilege.

## B.

Conroy contends the sanction imposed by the trial court in dismissing his amended complaint was excessive. He argues he acted in good faith because the email account was about to expire at the end of September 2022. Moreover, he asserts he was advised by Incollingo he was entitled to access the emails as administrator, and he had a duty to preserve the emails. He claims he deleted the emails only because he was concerned Kleiman would

38

erase and manipulate the emails. He further claims the emails were "duplicative" of non-privileged communications Klieman had with non-attorneys which were sufficient alone to support his amended complaint even if the Ettenson emails are considered privileged.

Conroy argues he is an "innocent plaintiff," and he "should not be penalized for his attorney's mistakes." Giannakopoulos v. Mid State Mall, 438 N.J. Super. 595, 608-09 (App. Div. 2014). Moreover, he asserts the court should have conducted a plenary hearing to assess whether he was an administrator, acted in good faith, and if the sanctions imposed were appropriate. He also contends a hearing was required regarding Kleiman's credibility as to whether he was aware his emails could be monitored, whether Ettenson was acting as company counsel, whether the contents of the emails would have been disclosed in discovery, and his intentions in deleting the emails.

Kleiman maintains the factors the Stengart Court identified for the trial court to consider on remand as to the appropriate sanctions were all met here. See Stengart, 201 N.J. at 326-27. He asserts the contents of his emails involved information relevant to a pending case, that Incollingo and Conroy deliberately examined the emails for months before producing them, that the legal advice contained therein would not have been divulged in discovery, and

that Incollingo admitted the emails were used as a blueprint to formulate Conroy's amended complaint. He contends the blame cannot be placed solely on Incollingo because Conroy destroyed the emails himself while litigation was pending, and there is no suggestion he deleted the emails on the advice of counsel. He also argues Conroy's misconduct gives him an unfair advantage in any future litigation as he cannot unsee the content of the emails, and thus Kleiman would be prejudiced by allowing the amended complaint to be reinstated.

Kleiman argues the Court in Stengart only remanded the issue for a hearing because no record had been developed as to the emails' "full use" in that case. Ibid. He argues remanding the case will place him in the middle of a dispute regarding who is more at fault for the invasion of his privacy, Conroy or Incollingo.

We review a trial court's imposition of sanctions under an abuse of discretion standard. Kornbleuth v. Westover, 241 N.J. 289, 300-01 (2020). "Our standard of review of the imposition of sanctions requires us to abstain from interfering with those discretionary decisions unless an injustice has been done." Cavallaro v. Jamco Prop. Mgmt., 334 N.J. Super. 557, 571 (App. Div. 2000).

Courts have the inherent power to sanction parties for behavior that is vexatious, burdensome, or harassing. See Brundage v. Est. of Carambio, 195 N.J. 575, 610 (2008) (recognizing the inherent power of courts to sanction parties as a means of enforcing proper practices); Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 252 (App. Div. 2007) (explaining that a court has the inherent power to sanction a party that has "acted in bad faith, vexatiously, wantonly or for oppressive reasons" (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991))). A sanction is generally not imposed without a finding that the "conduct constituted or was tantamount to bad faith." Dziubek v. Schumann, 275 N.J. Super. 428, 440 (App. Div. 1994).

The Stengart Court remanded to the trial court because "[t]he forensically retrieved version of the e-mails submitted to the Court [were] not easy to read or fully understand in isolation, and no record ha[d] yet been developed about the e-mails' full use. For the same reason, [the Court could not] determine how confidential or critical the messages [were]." 201 N.J. at 326-27. It further noted, "[i]n deciding what sanctions to impose, the trial court should evaluate the seriousness of the breach in light of the specific nature of the e-mails, the manner in which they were identified, reviewed, disseminated, and used, and other considerations noted by the Appellate Division." Id. at 327. The "other considerations" this court referenced were

41

"whether the information contained in the emails would have inevitably been divulged in discovery that would have occurred absent [the Firm's] knowledge of the emails' content, and the nature of the issues that have been or may in the future be pled." Id. at 327, 326 (alteration in original) (quoting Stengart v. Loving Care Agency, Inc., 408 N.J. Super. 54, 76-77 (App. Div. 2009)).

The reasons expressed by the Stengart Court for remanding to the trial court are not present here. The trial court here was familiar with the content of the emails and had addressed in detail the facts surrounding the breach of the attorney-client privilege leading up to the dismissal of plaintiff's amended complaint. It was fully aware of the manner in which the emails were obtained, utilized by plaintiff filing his amended complaint, and how Conroy deleted the emails he retrieved from Kleiman's email account so Kleiman would not realize his email account had been accessed by a third party. The court was able to determine how confidential or critical the messages were. It evaluated the seriousness of the breach in light of the specific nature of the emails, and the manner in which they were obtained and utilized. The court also had an adequate basis in the record to assess Conroy's conduct in deleting the emails, separate and apart from Incollingo's breach of RPC 4.4(b).

The court viewed both Incollingo and Conroy's conduct as concerning. Specifically, as to Conroy's conduct, the court noted, "[t]here is no doubt that

[Conroy]'s conduct was deliberate and it was improper and that it was an attempt to avoid the rules of discovery to gain an unpermitted advantage." Moreover, the court found there is no indication the content of these emails would have been uncovered during discovery given the privilege that attached to the documents.

Given the broad discretion afforded to trial courts to impose sanctions, we discern no basis to disturb the court's findings. The amended complaint was clearly based on the information improperly obtained through Kleiman's emails. Incollingo admitted to the court that the emails formed the basis for the amended complaint and that Conroy deleted certain emails because he was not "going to telegraph the fact that he got the documents." The court did not misapply its discretion in finding a dismissal of plaintiff's amended complaint and reinstatement of the initial complaint was the appropriate remedy. Moreover, the court did not misapply its discretion in not ordering a plenary hearing under these circumstances as the record was sufficient to support the court's findings.

C.

Conroy contends the trial court abused its discretion in striking his exceptions to the accounting. He argues the consent order gave him the right to request discovery regarding the accounting. He asserts Rule 1:6-2(a)

requires that "an application to the [c]ourt for an order shall be by motion," and the court struck plaintiff's exceptions despite defendant not filing a motion.

Kleiman responds he is protected by the business judgment rule, and the court had no reason to question his decision in the absence of fraud, self-dealing, or unconscionable conduct. He claims the parties agreed to not report damages to the vans unless there was a multi-vehicle incident and not to report minor damages to avoid increased insurance premiums, and they recognized they needed to keep the vans on the road to meet their commitments. Moreover, Kleiman asserts the court properly denied the application because Conroy submitted no proof as to his exceptions, and the court invited him to sign an affidavit stating he never received the repair estimates years earlier, but Conroy declined to do so.

Kleiman claims the consent order did not grant Conroy an automatic right to further discovery, and the trial court simply rejected Conroy's request for further discovery. He asserts the parties never agreed to reopen discovery so that Conroy could pursue claims not previously raised.

The court determined further discovery was not needed to address the "insurance issue" regarding whether those claims should be submitted for the

damaged delivery vans because Conroy was on notice, while represented by Incollingo, of Kleiman's actions.  The court asked plaintiff's counsel:

> Mr. Kravitz, is your client going to put his hand on the Bible and say he didn't know anything about this and that there's no way I would have agreed to this and that the $400,000 in damages should have been put through the insurance and take the vehicles off the road?
>
> I mean, does he disagree with . . . Kleiman's certification?
>
> MR. KRAVITZ:  I wouldn't put it that way, Judge.

The court further stated:

> I mean there's a paper trail on an email that dates back during this whole time that your client knew about this, that the vans were going back.
>
> He didn't answer and say hey, listen, why don't we get them all fixed so that we . . . don't have to worry about liability.

The court further commented:

> Make him sign an affidavit that he didn't get this email about the vans going back in and that none of the vans were damaged when he was there and that he would have definitely done everything to put this under insurance, despite the ramifications of the time parameters that would have been required.
>
> But if he signs off on that . . . then maybe you'll . . . take a deposition.
>
> . . . .

45

A-3064-23

MR. KRAVITZ: He's not going to say he didn't get the email and he's not going to say that he didn't know the vans had a ding.

He will say that had he been involved with this, he would have put the vans through insurance and, if that's not enough, then -- all right, then just dismiss this now.

In denying Conroy's request to conduct additional discovery regarding the accounting, the court noted:

But the only disagreement that . . . . Kravitz . . . has come up with has to do with damage to the Amazon trucks.

And what I was trying to test . . . Kravitz . . . about [was] the series of emails that are -- they're in the documents and . . . I recognize that it could be . . . Incollingo.

. . . .

They knew that there would have been damage. You can't deny any of that.

. . . .

But yet counsel, who had an ability to say to other counsel no, I'm not going to do this, those vehicles are damaged, let's see what we can do to try and recoup some of the money before we turn them over to Amazon because they knew that there would be an issue with that.

. . . .

. . . I don't care whether he was booted out of the company or not.  What I do care about is what

occurred in May, in that email, is that they knew about it.

They knew that it was a quick turnaround time with Amazon because they were both actively involved in all of that and that counsel -- nobody responded to it.

Nobody did anything. Nobody did anything to say hey, why don't we hold off on this thing with Amazon and see if we can't get these vans fixed . . . .

The court further stated:

I just don't see where there could be any factual dispute with regard to any exception because he was involved in it, through counsel, at that point and he failed to do his due diligence as well . . . .

. . . .

They made a . . . strategic business decision that they weren't going to get them fixed for every ding that came along and take it off the road.

. . . .

. . . I don't think you can point the finger at your 50 percent partner, when he had counsel involved that knew what was going to happen and never did anything to intervene because up until that point, . . . that's when everything really hit the fan, if you will, and then they knew it.

It further noted, "I don't see how there could be an exception to something that he was involved in . . . ." The court ultimately concluded it would not reopen discovery at that juncture and dismissed the exceptions.

47

We review a trial court's discovery rulings for abuse of discretion. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). An abuse of discretion "arises when a decision [was] 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

The parties entered into a consent order regarding the accounting which, in part, provided: "Should any of the parties seek further discovery relating to the Accounting . . . they shall first meet and confer, and if an agreement cannot be reached, then the issue shall be brought to the [c]ourt's attention through written correspondence . . . ." There was no automatic right to additional discovery after the accounting was completed. The court provided a detailed explanation for denying plaintiff's request to conduct additional discovery based on plaintiff's prior counsel's involvement and plaintiff's acknowledgment he previously saw the emails at issue. Despite receiving this notice, plaintiff failed to take any action.

We conclude the court did not misapply its discretion in denying Conroy's request for additional discovery and ultimately dismissing the exceptions for the reasons set forth in the court's oral decision.

D.

Kleiman contends in his cross-appeal that while the trial court addressed several factors under RPC 1.5(a), it did not consider RPC 1.5(a)(4), "the amount involved and the results obtained," and that he was the prevailing party. He also asserts the trial court failed to understand the time and labor required to remedy Conroy's actions and defend the sanctions order. Specifically, he highlights his counsels' efforts regarding the motion to seal, the motion for sanctions, the certification of services, discovery, and Conroy's second motion for reconsideration. He asserts he was forced to spend large sums of money for legal fees to defend a case where Conroy "concealed his use of privileged attorney-client communications and to redress the prejudicial effect of Conroy's familiarity and use of privileged communications." He asserts all of the fees requested were in connection with the email issue. In the alternative, he requests reimbursement only on the motions he prevailed on or successfully opposed: the motion to seal, the motion for sanctions, and Conroy's second motion for reconsideration, for a total of $105,970.50.

Conroy asserts there was no clear abuse of discretion by the trial court. He specifically points to the trial court's determination that there was "double billing going on." He asserts this was a "one-case issue" that was not complex, and the trial court carefully considered Kleiman's certification of services.

Trial courts have "broad discretion as to when, where, and under what circumstances counsel fees may be proper and the amount to be awarded." Passaic Valley Sewerage Comm'rs v. St. Paul Fire and Marine Ins. Co., 206 N.J. 596, 619 (2011) (quoting Iafelice ex rel. Wright v. Arpino, 319 N.J. Super. 581, 590 (App. Div. 1999)). "[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Litton Indus., Inc. v. IMO Indus. Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 444 (2001)). A "trial court [is] in the best position to weigh the equities and arguments of the parties." Packard-Bamberger, 167 N.J. at 447.

The abuse of discretion standard essentially means "a reviewing court should not substitute its judgment if the trial court's ruling was within a 'range of acceptable decisions.'" In re Kollman, 210 N.J. 557, 577 (2012) (quoting Parish v. Parish, 412 N.J. Super. 39, 73 (App. Div. 2010)). However, where a ruling is based on a mistaken application of the law, an appeals court reviews de novo. Kavanaugh v. Quigley, 63 N.J. Super. 153, 158 (App. Div. 1960); accord Payton, 148 N.J. at 559.

To determine the amount of a fee award, courts apply the test described in Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995). The court derives a "lodestar" fee by multiplying a reasonable hourly rate by the number of hours

reasonably worked.  Walker v. Giuffre, 209 N.J. 124, 130 (2012).

Reasonableness is informed by the factors listed in RPC 1.5(a).[9]

---

[9]  RPC 1.5(a) provides:

> A lawyer's fee shall be reasonable.  The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2)    the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3)    the fee customarily charged in the locality for similar legal services;
>
> (4)    the amount involved and the results obtained;
>
> (5)    the time limitations imposed by the client or by the circumstances;
>
> (6)    the nature and length of the professional relationship with the client;
>
> (7)    the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8)    whether the fee is fixed or contingent.

The trial court examined Kleiman's certification for attorney's fees and found them at times to be excessive. It noted there was "double billing" for certain events. It proceeded to detail the various entries it found were subject to reimbursement. It specifically referenced the date and entries for each attorney involved and the amount billed on each particular day that it found was reasonable under the circumstances. The court further recognized the experience of defendant's attorneys, their reputation in the community, and their respective billing rates. The court noted it was "not saying that the work wasn't done. I[t] just ha[d] to come up with something . . . reasonable."

We are satisfied the court fairly and diligently analyzed defendant's application for attorney's fees, making specific findings and providing a statement of reasons grounded in the record. We discern no reason to disturb the trial court's order and conclude the court did not misapply its discretion in making the award.

To the extent we have not addressed any of plaintiff's other arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-3064-23